IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 16, 2022 Session

## BRYANT JACKSON HARRIS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hawkins County**
**No. CC-18-CR-37   John F. Dugger, Jr., Judge**

FILED

DEC 16 2022

Clerk of the Appellate Courts
Rec'd by

**No. E2022-00446-CCA-R3-PC**

The Petitioner, Bryant Jackson Harris, appeals the Hawkins County Criminal Court's denial of his post-conviction petition, seeking relief from his convictions of first degree premeditated murder, first degree felony murder, and aggravated burglary and resulting effective sentence of life in confinement. On appeal, the Petitioner contends that he received the ineffective assistance of trial counsel. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Gregory P. Isaacs and Ashlee B. Mathis (on appeal) and J. Franklin Ammons (at hearing), Knoxville, Tennessee, for the appellant, Bryant Jackson Harris.

Jonathan Skrmetti, Attorney General and Reporter; Courtney N. Orr, Senior Assistant Attorney General; Dan E. Armstrong, District Attorney General; and Ritchie Collins and Cecil C. Mills, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case relates to the Petitioner's shooting Jeffrey Smith, who was the Petitioner's wife's half-brother, on July 21, 2011.[1] The next day, the Petitioner was charged in general sessions court with attempted first degree premeditated murder. The victim died from his

---

[1] On August 8, 2022, this court entered an order taking judicial notice of the appellate record in the Petitioner's direct appeal of his convictions.

injuries on January 1, 2012, more than five months after the shooting. Consequently, the charge was amended to first degree premeditated murder on June 8, 2012. On December 10, 2012, the Hawkins County Grand Jury indicted the Petitioner for first degree premeditated murder. On June 3, 2013, the grand jury also charged him by presentment with one count of first degree felony murder committed during the perpetration of any burglary and one count of aggravated burglary. The Petitioner went to trial for the three offenses in October 2014.

The evidence at trial showed that on the day of the shooting, the Petitioner went to Chuck Myers's house, where the victim was staying. *See State v. Bryant Jackson Harris*, No. E2015-01724-CCA-R3-CD, 2016 WL 6560012, at \*3 (Tenn. Crim. App. Nov. 4, 2016), *perm. app. denied* (Tenn. Feb. 23, 2017). Mr. Myers testified that he let the Petitioner into his home and that the Petitioner went downstairs to the victim's bedroom. *Id.* Mr. Myers heard the Petitioner yell, "'[Y]ou low down S.O.B. I'm going to kill your a--.'" *Id.* Mr. Myers followed the Petitioner downstairs, saw the victim lying in bed, and saw the victim stand up in front of the Petitioner. *Id.* The Petitioner and the victim were four or five steps apart, and the Petitioner had a gun by his side. *Id.* The Petitioner raised the gun and shot the victim in the abdomen, and the victim fell onto the bed. *Id.* The Petitioner fired a second shot that struck the victim in the left elbow and arm. *Id.* The Petitioner tried to fire a third shot, but the gun did not fire. *Id.* Mr. Myers saw cartridge casings fall to the floor, told the Petitioner to leave, and called 911. *Id.*

The State played the 911 call for the jury. *Id.* at \*1. During the call, Mr. Myers reported that a man with "a long brown pistol" had shot the victim twice. *Id.* Mr. Myers told the 911 operator that the man went outside after the shooting but that he had re-entered the house and was holding a knife. *Id.* At the end of the call, Mr. Myers said the man was back outside and was standing in the driveway. *Id.*

On cross-examination, Mr. Myers testified that he experienced serious health issues prior to the Petitioner's trial and that he suffered some memory loss. *Id.* at \*3. Mr. Myers spoke with an officer at the scene of the shooting but could not remember at trial what he told the officer. *Id.* He agreed that his statement to the officer was more accurate than his trial testimony. *Id.*

A police officer testified that when he arrived at Mr. Myers's home, the Petitioner was sitting outside on a large rock next to the driveway. *Id.* at \*2. The officer took the Petitioner into custody but did not find any weapons on his person. *Id.* The officer did not see any bloodstains on the Petitioner's clothing, the Petitioner did not appear to be injured, and the Petitioner did not complain of any injuries. *Id.* A .22-caliber single-action revolver and a knife were on the tailgate of the Petitioner's truck, which was parked in the driveway. *Id.* The victim was inside the house. *Id.* He had blood on his face, was holding his abdomen, and was gasping for air. *Id.* A second officer at the scene spoke with Mr. Myers. *Id.* The officer testified that Mr. Myers told him that the Petitioner "'pushed his way past

[Mr. Myers] and went down the steps and started yelling at the victim, and then he heard gunshots . . . and went down there and actually saw the last two.'" *Id.* The officer identified photographs, showing blood spatter on the floor in the downstairs hallway and on the victim's bed. *Id.* at *1.

The victim sustained multiple injuries and had surgery to close several holes in his colon and duodenum. *Id.* at *3. He developed complications, and his condition deteriorated. *Id.* He eventually went into cardiac arrest and died several days later. *Id.* The forensic pathologist who performed the victim's autopsy concluded that he died of complications from a gunshot wound to the abdomen and that his manner of death was homicide. *Id.* at *4.

The Petitioner testified that he had known the victim since the victim was seven years old, that he and the victim worked together for more than twenty years, and that he treated the victim like his son. *Id.* at *5. The Petitioner claimed that he went to Mr. Myers's residence on the day of the shooting to check on the victim because the Petitioner's wife could not contact the victim by telephone and was concerned about the victim. *Id.* When the Petitioner arrived at Mr. Myers's home, Mr. Myers let him inside. *Id.* The Petitioner turned to go downstairs to the victim's bedroom, and Mr. Myers kicked him in the back, causing him to fall down the stairs. *Id.* The victim then beat the Petitioner with a cane or pipe. *Id.* The Petitioner grabbed the object, so the victim reached under a pillowcase, pulled out a revolver, and tried to shoot the Petitioner. *Id.* The Petitioner and the victim struggled over the gun. *Id.* The victim "held the gun," and the gun fired three times. *Id.* The Petitioner said that he was on the floor when the gun fired and that the gun was pointed upward. *Id.*

The Petitioner testified that the gun was on the bedroom floor and that he picked up the gun because he did not want the victim to shoot at him again. *Id.* The Petitioner went outside, placed the gun and his pocketknife on the tailgate of his truck, and waited for the police. *Id.* The Petitioner denied owning the gun, going to the residence to harm the victim, or intending to shoot the victim. *Id.*

On cross-examination, the Petitioner testified that his wife and the victim shared the same mother. *Id.* at *6. The Petitioner's wife filed a lawsuit on her mother's behalf in 2008 and ended up receiving a $210,000 settlement in 2009. *Id.* The State asked the Petitioner if the victim was upset about the settlement and if the victim had threatened to sue the Petitioner's wife for part of the money. *See id.* The Petitioner denied that he went to Mr. Myers's home because the victim was "'raising a stink'" about the settlement and was harassing the Petitioner's wife. *Id.* at *7.

The Petitioner testified that he hit his elbow, shoulders, and knees when Mr. Myers kicked him down the stairs. *Id.* at *6. The Petitioner was released from jail the day after the shooting and went to the emergency room on July 26, 2011. *See id.*

On redirect examination, the Petitioner acknowledged that his emergency room records stated that he had bruises on his forearm, humerus, and back and that he had sprains and strains on his back and neck. *Id.* at *7. He also acknowledged that he went to the hospital on the advice of trial counsel to document the injuries he received during his struggle with the victim. *Id.* The defense introduced into evidence sixteen photographs taken by the Petitioner's daughter the day after he was released from jail. *Id.* The Petitioner said the photographs showed his injuries. *Id.*

The Petitioner's wife testified that she had a good relationship with the victim and that they never argued about the lawsuit settlement. *Id.* at *8. On the day of the shooting, the Petitioner's wife asked the Petitioner to check on the victim. *Id.* The Petitioner did not own a gun and did not have a gun when he left their home. *Id.* On cross-examination, the Petitioner's wife testified that the Petitioner went to the hospital after he was released from jail because he was "'black and blue.'" *Id.*

The Petitioner's son-in-law testified that the victim used to live with him and identified the revolver in a crime scene photograph as the victim's gun. *Id.* at *9. Numerous witnesses, including the Petitioner's church pastor, testified on his behalf regarding his character for truthfulness. *See id.* Nevertheless, the jury convicted him as charged of first degree premeditated murder, first degree felony murder, and aggravated burglary. *Id.* After a sentencing hearing, he received concurrent sentences of life for the murder convictions and six years for the aggravated burglary conviction, a Class C felony. *Id.*

On direct appeal of his convictions, the Petitioner claimed that the evidence was insufficient to support the convictions, that Mr. Myers's testimony should have been stricken due to his memory loss, and that the trial court should have declared a mistrial when the prosecutor asked the Petitioner whether he told police officers at the crime scene "'any of this.'" *See id.* at *9-13. This court affirmed the Petitioner's convictions but remanded the case for merger of the murder convictions. *Id.* at *13.

After our supreme court denied the Petitioner's application for permission to appeal, retained counsel filed a timely petition for post-conviction relief in which the Petitioner alleged that he received the ineffective assistance of trial counsel. Relevant to this appeal, the Petitioner claimed that trial counsel was ineffective for failing to request a speedy trial; failing to interview Mr. Myers before trial; failing to object to the prosecutor's improper commentary during closing arguments; failing to retain experts in fingerprint, blood-spatter analysis and forensic firearms analysis; and making improper gestures during the Petitioner's cross-examination testimony. The Petitioner also asserted that even if trial counsel's individual errors did not amount to ineffective assistance, the cumulative effect of the errors warranted relief.

The post-conviction court held an evidentiary hearing on February 18, 2022. At the hearing, trial counsel testified for the Petitioner that he was licensed to practice law in Alabama in 1976 and Tennessee in 1978 and that he had been in private practice his entire career, focusing mainly on criminal defense. Trial counsel's law firm was comprised of four lawyers, five support staff, a private investigator, an intern, and an employee who worked two days per week. Trial counsel said that he had participated in "hundreds" of trials, that eighty-five to ninety-five percent of those trials were criminal trials, and that ten to twelve of the criminal trials were first degree murder cases. All of the first degree murder cases involved a self-defense claim.

Trial counsel testified that the Petitioner was "a good man." The Petitioner retained trial counsel to represent him in general sessions court for attempted first degree murder, and trial counsel met with the Petitioner. Trial counsel's investigator also met with the Petitioner and reviewed the Petitioner's case file with trial counsel.

Trial counsel testified that he attended high school with Chuck Myers. He described Mr. Myers as "an acquaintance" and said their relationship was "[p]leasant." Trial counsel told the Petitioner that he knew Mr. Myers and that he thought he would be able to talk with Mr. Myers "easily." The Petitioner "was comfortable with that" and was present in trial counsel's office two or three times when trial counsel spoke with Mr. Myers on the telephone. Post-conviction counsel showed a document to trial counsel, and trial counsel identified it as a letter Mr. Wynne wrote to trial counsel. In the letter, which was dated August 23, 2011, Mr. Wynn stated, "I asked you before about trying to talk to Myers (the owner of the house) and you told me not to. I would like to try and get a statement if possible." Trial counsel said his investigator "eventually interview[ed] Mr. Myers after the preliminary hearing."

Trial counsel testified that he told the Petitioner that the Petitioner was going to be charged with first degree murder if the victim died. Trial counsel and the Petitioner talked about the Petitioner's right to a speedy trial, but trial counsel and the Petitioner did not talk about requesting a speedy trial because the case for attempted first degree murder had not been "set" in criminal court. Moreover, the Petitioner "was not in any hurry to get to court." Trial counsel "check[ed] on" the victim but did not foresee him dying. The victim's wound "would not heal for whatever reason," and he stayed in the hospital for an extended period of time. However, the Petitioner and the Petitioner's wife told trial counsel that the victim was in the hospital because the victim was addicted to pain pills. Trial counsel acknowledged that it would have been "beneficial" for the Petitioner to have gone to trial prior to the victim's death.

Trial counsel testified that the Petitioner was indicted in criminal court for first degree premeditated murder on December 10, 2012. On June 3, 2013, the Petitioner was charged by presentment in criminal court with first degree felony murder and aggravated burglary. Trial counsel received discovery and reviewed the discovery materials with the

Petitioner. Trial counsel met with the Petitioner "numerous" times, and the Petitioner came to trial counsel's office "regularly." At some point, the State offered to accept the Petitioner's guilty plea to a lesser charge in exchange for one year in confinement and fourteen years on probation. Trial counsel said that he did not remember the plea offense but that "[i]t was not a murder charge. It was some type of offense outside the range of the offense." Trial counsel stated that he "did everything but get down on [his] knees" to try to convince the Petitioner to accept the offer but that the Petitioner would not listen to trial counsel. The Petitioner never denied shooting the victim but thought he did so in self-defense.

Trial counsel testified that he did not hire an expert to review the blood spatter at the crime scene because the revolver "had to be cocked back and shot before it would go off on each occasion." Trial counsel also did not hire an expert to conduct fingerprint analysis on the revolver because the Petitioner told trial counsel that the victim never touched the gun.

Trial counsel acknowledged that during the prosecutor's cross-examination of the Petitioner at trial, the following exchange occurred in front of the jury:

> [THE STATE]: Your Honor, he is being coached over here.

> THE COURT: Don't be nodding your head yes or no. I have watched you do that, too. Don't nod your head while he is answering.

> [TRIAL COUNSEL]: Judge, I'm not coaching anybody.

> THE COURT: Just let him answer, your client answer. Go ahead.

> [THE STATE]: Just one second, Your Honor.

> [TRIAL COUNSEL]: Coached, I object to that statement, Your Honor. It is grossly untrue.

> [THE STATE]: Your Honor, I asked the question. He says yes and he says yes. That's what happened.

> [TRIAL COUNSEL]: I am a human being, Your Honor, I have emotions, too, but I am not coaching anybody.

> THE COURT: You do have emotions but you were nodding your head in an affirmative motion when he was asking a question and your client says yes.

Trial counsel explained that he sometimes nodded after the Petitioner said yes but that the jury could not see trial counsel because "I was completely blocked off from the jury." Trial counsel said that although he was nodding, he was not telling the Petitioner to say yes and was not coaching the Petitioner. Trial counsel stated that the prosecutor should have approached the bench to accuse trial counsel of coaching the Petitioner and that the prosecutor's raising the issue in front of the jury "was totally improper." Trial counsel said that he "could see how someone might think" he was coaching the Petitioner and that the prosecutor's actions made him "extremely angry." Trial counsel reiterated that the jury did not see him nodding his head.

Trial counsel acknowledged that during the State's closing arguments, the prosecutor stated, "'I don't think any one of us would think that Chuck Myers kicked [the Petitioner] down the stairs.'" Although the statement could have been construed as the prosecutor's personal opinion, trial counsel did not object because he did not want to call attention to the statement.

On cross-examination, trial counsel testified that the Petitioner never asked that his trial proceed more quickly. Trial counsel acknowledged that it often took the State one year to indict a defendant and that trial counsel had never been successful in forcing the State to proceed to trial before a defendant had been indicted in criminal court. Trial counsel said that he talked with Mr. Myers about the case at least five times on the telephone and that Mr. Myers would not change his story "one iota." The last time trial counsel telephoned Mr. Myers, Mr. Myers "got irate" with trial counsel.

Trial counsel acknowledged that blood was in the bedroom where the shooting occurred. However, there was no blood on the Petitioner. Therefore, trial counsel thought that he would have been unsuccessful in saying that a fight occurred and that a blood-spatter expert "without a doubt" could have hurt the defense. Trial counsel also thought that hiring a fingerprint expert could have hurt the defense because the revolver had to be cocked every time it was fired. Trial counsel acknowledged that he did not object to the prosecutor's statement during the State's closing argument but said that he was "bitter" about the State's raising the coaching issue in front of the jury. Trial counsel maintained that he was not trying to coach the Petitioner and explained, "If [the Petitioner] would answer a question I might nod my head yes. I never nodded my head no. It was just a response to what he said, not an attempt to coach him." Trial counsel said that although the jury could not see him nodding, "it was not beneficial to [the Petitioner] the way that was done, I'll tell you that."

The seventy-one-year old Petitioner testified that he was about sixty-two years old at the time of the shooting. The Petitioner and trial counsel talked about "several things," but the Petitioner did not remember if they talked about his right to a speedy trial prior to the victim's death. The Petitioner said that if they had done so, he would have requested a speedy trial. The Petitioner thought he was innocent.

- 7 -

On cross-examination, the Petitioner testified that after the shooting, his son-in-law contacted trial counsel. The Petitioner had never met trial counsel previously but retained trial counsel because he thought, at the time, that trial counsel was a good attorney. The Petitioner said he did not know how many hours trial counsel worked on his case. On redirect examination, post-conviction counsel asked the Petitioner if he was "pleased" with trial counsel's services. The Petitioner answered, "Not really but yeah."

On March 14, 2022, the post-conviction court entered an order denying the petition for post-conviction relief. Regarding the Petitioner's claim that trial counsel was ineffective for failing to request a speedy trial, the post-conviction court noted that the Petitioner was "objecting" to the length of the delay between the offense date and the date of the victim's death, which was about five months, and concluded that trial counsel was not ineffective. As to the issue of whether trial counsel was ineffective for failing to interview Mr. Myers, the post-conviction court accredited trial counsel's testimony that he spoke with Mr. Myers several times on the telephone. The post-conviction court addressed trial counsel's failure to object to the prosecutor's statement during closing arguments and concluded that trial counsel made a tactical decision not to object so as not to draw attention to the statement. Regarding trial counsel's nodding his head during the Petitioner's cross-examination testimony, the post-conviction court concluded that the Petitioner failed to show by clear and convincing evidence that trial counsel's actions affected the Petitioner's credibility with the jury. As to the Petitioner's claim that trial counsel was ineffective for failing to hire blood-spatter and fingerprint experts, the post-conviction court concluded that trial counsel made tactical decisions not to hire the experts because trial counsel thought they could harm the Petitioner's self-defense claim. Finally, the post-conviction court concluded that the Petitioner's claims did not individually or collectively warrant relief.

## ANALYSIS

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn. Crim. App. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See Wiley v. State*, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of witnesses or the weight of their testimony. *Id.* However, review of a post-conviction court's application of the law to the facts of the case is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact.

*See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *see Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982).

The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see Goad*, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

# I. Speedy Trial

The Petitioner claims that the post-conviction court erred by determining that trial counsel was not ineffective for failing to request a speedy trial for attempted first degree murder. He argues that if trial counsel had done so before the victim died or before the State amended the charge to first degree murder, the Petitioner would have received a sentence of fifteen to twenty-five years if convicted instead of a life sentence. The State argues that trial counsel made a reasoned, strategic decision not to request a speedy trial. The State also argues that the Petitioner cannot demonstrate prejudice because even if trial counsel had made the request, it is unlikely the Petitioner would have gone to trial before the victim died. We agree with the State.

The right to a speedy trial, which is guaranteed by the Sixth Amendment to the United States Constitution and by article I, section 9 of the Tennessee Constitution, "attaches at the time of arrest or indictment, whichever comes first, and continues until the date of the trial." *State v. Vickers*, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997). To determine whether a defendant's constitutional right to a speedy trial has been violated, this court must conduct the balancing test set forth in *Barker v. Wingo*, 407 U.S. 514 (1972). *See State v. Wood*, 924 S.W.2d 342, 346 (Tenn. 1996); *State v. Baker*, 614 S.W.2d 352, 353 (Tenn. 1981). Under the *Barker* analysis, the following four factors must be considered: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's assertion of the right to a speedy trial; and (4) the prejudice resulting from the delay. 407 U.S. at 530. The most important consideration is the prejudice factor. *State v. Simmons*, 54 S.W.3d 755, 760 (Tenn. 2001). As noted by the State, a delay generally must approach one year to trigger a *Barker* analysis. *Doggett v. United States*, 505 U.S. 647, 652 (1992).

Here, trial counsel testified that a request for a speedy trial would have been premature because the Petitioner had not been indicted in criminal court. Moreover, trial counsel testified while it would have been beneficial for the Petitioner to have gone to trial for attempted first degree murder before the victim died, trial counsel did not foresee the victim's death because the Petitioner and the Petitioner's wife told him that the victim was in the hospital for an addiction to pain pills. We conclude that the record supports the post-conviction court's determination that trial counsel was not deficient for not filing a request for speedy trial in general sessions court. Therefore, we agree with the State that the Petitioner has failed to demonstrate that trial counsel was deficient or that he was prejudiced by any deficiency.

# II. Mr. Myers

The Petitioner claims that the post-conviction court erred by ruling that trial counsel was not ineffective for failing to interview Mr. Myers. The Petitioner asserts that although trial counsel may have spoken with Mr. Myers several times on the telephone, trial counsel should have allowed his investigator to interview Mr. Myers close in time to the shooting

in order to preserve Mr. Myers's eyewitness account of the event. The State argues that the Petitioner is not entitled to relief because trial counsel testified that Mr. Myers did not change his story. We agree with the State that the Petitioner is not entitled to relief.

Trial counsel testified that he and his investigator talked with Mr. Myers and that Mr. Myers's story did not change "one iota." Our review of the trial record confirms that Mr. Myers told the 911 operator, a police officer at the scene, and the jury that he let the Petitioner into his home and that the Petitioner immediately went downstairs and shot the victim. We note that during trial counsel's cross-examination of Mr. Myers, Mr. Myers acknowledged that he was having memory issues and that his statement to the police officer was more reliable than his trial testimony. However, the Petitioner has not explained or offered any evidence as to how the investigator's failure to interview Mr. Myers close in time to the shooting prejudiced his case. Therefore, we conclude that the Petitioner has failed to show that trial counsel was deficient or that he was prejudiced by any deficiency. The record supports the post-conviction court's determination that the Petitioner failed to establish this claim.

### III. Experts

The Petitioner contends that the post-conviction court erred by determining that trial counsel was not ineffective for failing to consult with experts in fingerprint, firearms, and blood-spatter analysis. He argues that the experts could have corroborated his self-defense claim and his claim that the victim was the first aggressor. The State argues that the Petitioner is not entitled to relief because trial counsel made a reasonable, strategic decision not to hire expert witnesses. We agree with the State.

At trial, the Petitioner claimed that the victim hit him with an object and that the victim was shot accidentally while they were struggling over the victim's gun. However, according to the evidence presented by the State, no blood was on the Petitioner, and the gun had to be cocked three times in order to fire three shots. Trial counsel testified at the evidentiary hearing that experts in blood-spatter and fingerprint analysis could have hurt the Petitioner's claims. The record supports the post-conviction court's findings that trial counsel's decision not to consult with the experts was a reasonable trial strategy in light of the evidence. Additionally, as noted by the State, the Petitioner did not have any experts testify at the evidentiary hearing. In order "[t]o succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (citing *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Id.* (quoting *Black*, 794 S.W.2d at 757) Therefore, the Petitioner has failed to show that he received the ineffective assistance of trial counsel.

## IV. Trial Counsel's Actions on Cross-Examination

The Petitioner claims that the post-conviction court erred by determining that trial counsel was not ineffective when trial counsel nodded his head while the Petitioner was testifying on cross-examination at trial. The record supports the post-conviction court's determination that the Petitioner failed to demonstrate prejudice. Trial counsel testified that the jury could not see him nodding his head, and trial counsel vehemently denied in front of the jury that he was coaching the Petitioner. In any event, the State's proof against the Petitioner was strong. Specifically, the evidence showed that the Petitioner went to Mr. Myers's home with a gun and a knife to confront the victim about a dispute between the victim and the Petitioner's wife over a lawsuit settlement. Mr. Myers testified that he followed the Petitioner downstairs, that he saw the Petitioner and the victim standing several steps apart, and that he saw the Petitioner shoot the victim. Moreover, Mr. Myers told the 911 operator and a police officer that he saw the Petitioner shoot the victim. Although the Petitioner claimed that Mr. Myers kicked him down the stairs, the Petitioner did not appear to be injured or report any injuries when the police arrived. Additionally, although the Petitioner claimed that the victim was shot accidentally while they were struggling over the gun, there was no blood on the Petitioner and the gun had to be cocked each time it was fired, which rebutted the Petitioner's self-defense claim. Therefore, we agree with the post-conviction court that the Petitioner is not entitled to relief.

## V. Closing Argument

The Petitioner asserts that the post-conviction court erred in determining that trial counsel was not ineffective for failing to object to an improper comment made by the prosecutor during closing arguments. The State argues that the Petitioner is not entitled to relief because trial counsel made a strategic decision not to object. We agree with the State.

At the evidentiary hearing, trial counsel acknowledged that he did not object when the prosecutor stated, "'I don't think any one of us would think that Chuck Myers kicked [the Petitioner] down the stairs.'" Trial counsel also acknowledged that the statement could have been construed as the prosecutor's improperly stating his opinion about witness credibility. However, trial counsel explained that he did not object because he did not want to draw the jury's attention to the statement.

As this court has recognized, "The decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions." *Derek T. Payne v. State*, No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *15 (Tenn. Crim. App. Jan. 15, 2010). The post-conviction court determined that the Petitioner was not entitled to relief because trial counsel made a strategic decision not to object to the prosecutor's statement. The record supports the post-conviction court's determination that trial counsel's failure to object does not constitute deficient performance.

## VI. Cumulative Error

Finally, the Petitioner contends that even if trial counsel's individual errors do not amount to ineffective assistance, the cumulative effect of the errors warrants relief. "To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010). Moreover, in the context of an ineffective assistance of counsel claim, cumulative error "examines the prejudicial effect of multiple instances of deficient performance." *Tommy Dale Adams v. State*, No. M2018-00470-CCA-R3-PC, 2019 WL 6999719, at *31 (Tenn. Crim. App. Dec. 20, 2019); *see Demetrius Grimes v. State*, No. E2021-00120-CCA-R3-PC, 2022 WL 557739, at *8 (Tenn. Crim. App. Feb. 24, 2022), *perm. app. denied*, (Tenn. June 8, 2022); *Thomas Edward Clardy v. State*, No. M2017-01193-CCA-R3-PC, 2018 WL 5046032, at *7 (Tenn. Crim. App. Oct. 17, 2018). In this case, the Petitioner has not demonstrated there were multiple instances of deficient performance so he is not entitled to relief under the cumulative error doctrine.

## CONCLUSION

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

JOHN W. CAMPBELL, SR., JUDGE

- 13 -